UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of the Search of

(Name, Address or brief description of person or property to be searched)

**The Premises Known as
17 Russell Street
Apartment 9 (Basement)
Somerville, Massachusetts**

*APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT*

M. J. No. 09-900-MBB

I, **TODD I RICHARDS**, being duly sworn, depose and say:

I am a(n) __Special Agent, Federal Bureau of Investigation__ and have reason to believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

**17 Russell Street, Apartment 9 (Basement), Somerville, Massachusetts, more fully described in Attachment A, which is attached hereto and incorporated by reference herein**

in the _____ District of __Massachusetts__ there is now concealed a certain person or property, namely (describe the person or property)

**the items described in Attachment B, which is attached hereto and incorporated by reference herein**

which are (give alleged ground for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

**evidence and instrumentalities**

of violations of Title __21__ United States Code, Section(s) __846, 841(a)(1), 963, & 952(a)__. The facts to support the issuance of a Search Warrant are as follows:

**See** attached Affidavit of Todd I. Richards

Continued on the attached sheet and made a part hereof: **X** Yes ☐ No

_____
Signature of Affiant
**TODD I. RICHARDS
Special Agent - FBI**

Sworn to before me and subscribed in my presence,

November 13 , 2009 @ 5:10 PM.        at        Boston, Massachusetts
Date                                                              City and State

_____                    _____
MARIANNE B. BOWLER                                        Signature of Judicial Officer
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

17 Russell Street, Apartment 9 (basement),
Somerville, MA, is occupied by RALPH DELEO.
17 Russell Street is described as a two and a
half story, multi-family stand alone
clapboard residence, which is beige in color
with brown trim and a burgundy roof line.
There are steps in the front of the house,
facing Russell Street, which lead to a porch
where there is a single door with the number
"17" in gold on the center of the door.
There is a second door on the left-side of
the building.  There is a fire escape on the
right side of the building.  There is a
shared driveway (shared with the house to the
right) on the right side of the building
leading to a parking area in the back of the
building.  There is a door in the back of the
building that leads to the basement of the
building where the Target Premises are
located.

## ATTACHMENT B

1.  Books, records, notes, ledgers, and any other
    papers or records relating to the purchase,
    transportation, shipment, ordering, sale,
    importation, manufacture, and/or distribution
    of controlled substances and/or records
    relating to the receipt, disposition, and/or
    laundering of proceeds from the distribution
    of controlled substances, such as cocaine
    and/or marijuana, and/or records or
    electronic devices reflecting the identity of
    co-conspirators and drug customers, as well
    as their addresses, telephone, and pager
    numbers.  Such documents include, but are not
    limited to, telephone address books,
    planners, receipts, state and federal income
    tax returns and supporting paperwork, notes,
    ledgers, bank records, money orders, wire
    transfers, cashier's checks, passbooks,
    certificates of deposit, bills, vehicle
    rental receipts, credit card receipts, hotel
    receipts, meal receipts, travel agency
    vouchers, travel schedules, shipment records,
    telephone bills and/or toll records and
    bills.

2.  Cash and currency, and other items of value
    made or derived from trafficking in illegal
    substances or documents related thereto.
    Such items include, but are not limited to
    jewelry, precious metals, titles, deeds,
    monetary notes, registrations, purchase or
    sale invoices, bank records, or any other
    papers concerning financial transactions
    relating to obtaining, transferring,
    laundering, concealing, or expending money or
    other items of value made or derived from
    trafficking in illegal substances.

3.  Documents reflecting dominion and/or control
    of 17 Russell Street, Apt. 9 (basement
    apartment), Somerville, MA, including, but
    not limited to, canceled mail, photographs,
    personal telephone books, diaries, bills and
    statements, videotapes, keys, identification
    cards and documents, airline tickets and
    related travel documents, bank books, checks,
    and check registers.

4.   Documents or tangible evidence reflecting
     dominion, ownership, and/or control by RALPH
     DELEO over any bank accounts, safe deposit
     boxes, stocks, bonds, mutual funds, and any
     other financial and/or monetary assets,
     instruments or interests, and over any
     tangible assets such as motor vehicles, real
     property, and commercial storage facilities.

5.   Photographs of individuals, property, and/or
     illegal controlled substances.

6.   A computer or computers, and electronic storage media
     such as floppy discs, compact discs, removable hard
     drives, and thumb drives, containing the documents,
     records, and other items referenced in 1-5 above.

## AFFIDAVIT OF TODD I. RICHARDS

TODD I. RICHARDS, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states as follows:

1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.  I have been a Special Agent with the FBI for the past 21 years.  From 1990 to 1997, I was assigned to the Bank Robbery Task Force/Violent Crimes Squad of the Boston Division of the FBI.  In that capacity, I investigated bank robberies, armored car robberies, theft from interstate shipments, interstate transportation of stolen property, and firearms offenses.  From 1997 to 2000, I was assigned to the Organized Crime Squad of the Boston Division, investigating La Cosa Nostra, a criminal organization described further below, among other organizations.  From 2001 to 2006, I was assigned to the Lowell Resident Agency, where I participated in investigations of various criminal offenses, including violent crime, organized crime and outlaw motorcycle gangs.  From late 2006 to 2008, I had a dual assignment as the Acting Supervisor for the High Intensity Drug Trafficking Area ("HIDTA") Investigative Support Center (ISC) and the FBI's New England Regional Coordinator for the

Organized Crime Drug Task Force.  I was recently reassigned to the Organized Crime Squad of the Boston Division of the FBI where I am responsible for investigating La Cosa Nostra.  Prior to my employment with the FBI, I was a police officer for six years in Nashua, New Hampshire.

2.   In the above assignments, I have participated in investigations involving Organized Crime, Domestic and International Terrorism, and violent crime, including firearms offenses.  I have also participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, methamphetamine, and other substances, in violation of the federal anti-drug laws, including Sections 841 and 846 of Title 21, United States Code, including supervising the controlled purchase of narcotics.  I have also assisted in numerous other investigations in different capacities, such as surveillance, execution of search warrants, execution of arrest warrants, debriefing of cooperating individuals, and other investigative methods.  These investigations have resulted in arrests and convictions for violations of state and federal drug laws; seizures of drugs, firearms, and money; and forfeiture of money, vehicles, and real estate.

3.   I have received training in the field of narcotics enforcement and investigations both through the FBI Academy and a two-week Drug Enforcement Administration drug investigators'

2

course and a one-week course on supervising drug investigations
sponsored by HIDTA.

4.   Through my training, education, and experience, I have
become familiar with the habits, methods, routines, practices and
procedures commonly used by persons engaged in the trafficking of
illegal drugs.  I have also become familiar with the manner in
which illegal drugs are transported, stored, and distributed, and
with the methods of payment for such drugs.  I am also familiar
with the various items used to compound, process, deliver, and
serve as containers for cocaine, heroin, and other controlled
substances.  Specifically, I am aware that drug traffickers
commonly use cellular telephones in furtherance of their drug
trafficking activities and that they frequently change cellular
telephone numbers and cellular telephones in an effort to thwart
law enforcement's use of electronic surveillance.  I am also
familiar with the manner in which drug traffickers use
telephones; coded, veiled, or slang-filled telephone
conversations; pagers; coded pager messages; and other means to
facilitate their illegal activities.  I am also familiar with the
vernacular or street names for buyers and sellers of drugs and
the various methods used by such persons to disguise the subject
matters of their conversations and their operations.  Through my
training, education and experience, I have become familiar with
the manner in which illegal drugs are transported, stored, and

3

distributed, and with the methods of payment for such drugs.

5.    I submit this affidavit in support of an application for the issuance of a search warrant authorizing the search of an apartment located at 17 Russell Street, Apartment 9 (Basement), Somerville, MA (hereinafter "the Target Premises," more fully described below).  As described more fully below, the Target Premises is the residence of RALPH DELEO ("DELEO").   On November 4, 2009, DELEO was charged by criminal complaint in the United States District Court for the District of Arkansas with conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 & 841(a)(1).  The Target Premises is the location where DELEO lived throughout the investigation of his cocaine trafficking activities -- i.e., from at least December 2008 through the present.

6.    I submit that there is probable cause to believe that U.S. currency, documents and other records detailing the purchases and distribution of cocaine and marijuana, telephones or communication devices used to facilitate the purchases and distribution of narcotics, and other evidence of violations of 21 U.S.C. §§ 846 & 841(a)(1), and 21 U.S.C. §§ 963 & 952(a), by DELEO are located at the Target Premises.

4

## DESCRIPTION OF THE TARGET PREMISES

7.    I have observed the Target Premises, spoken with agents who have observed the Target Premises, and have reviewed several photographs of the Target Premises.  It is described as follows:

> 17 Russell Street, Apartment 9 (basement), Somerville, MA, is occupied by RALPH DELEO. 17 Russell Street is described as a two and a half story, multi-family stand alone clapboard residence, which is beige in color with brown trim and a burgundy roof line. There are steps in the front of the house, facing Russell Street, which lead to a porch where there is a single door with the number "17" in gold on the center of the door. There is a second door on the left-side of the building.  There is a fire escape on the right side of the building.  There is a shared driveway (shared with the house to the right) on the right side of the building leading to a parking area in the back of the building.  There is a door in the back of the building that leads to the basement of the building where the Target Premises are located.

Four photographs of the Target Premises are attached to this affidavit as Exhibit A.  The last two photographs show the back of the building, DELEO's Lexus SUV, his bicycle, and the back door that leads to the Target Premises.

## THE DRUG TRAFFICKING ACTIVITIES OF DELEO

8.    From December 2008 to the present, I have been the Boston case agent on a multi-jurisdictional investigation of RALPH DELEO, who is a significant organized crime figure operating out of the Boston, Massachusetts, area.  Based on the investigation to date, I believe that DELEO is involved in

trafficking cocaine and marijuana, as well being involved in other criminal activity.

9.    On November 4, 2009, DELEO was charged by criminal complaint in the United States District Court for the Eastern District of Arkansas with conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 & 841(a)(1).  That charge was based on a wiretap  investigation in Arkansas that began in December 2008.

10.    On December 2, 2008, the Honorable Brian S. Miller, United States District Court for the Eastern District of Arkansas, entered an Order authorizing the interception of wire communications to and from the cellular telephone of GEORGE WYLIE THOMPSON ("THOMPSON").  Through the course of those interceptions, numerous telephone conversations occurred involving THOMPSON, DELEO, and a third individual, TRI CAM LE ("TRI LE").  THOMPSON and TRI LE are believed to be associates of DELEO who at the time resided in and around the greater Little Rock, Arkansas, area.

11.    Beginning December 4, 2008, a series of calls was intercepted between THOMPSON and TRI LE, related to TRI LE's travel from the southwest area of the United States to Little Rock, Arkansas.  For example, on Friday, December 5, 2008, at approximately 4:54 p.m., THOMPSON called TRI LE, who said he was

6

more than half way and should be there on Saturday or early
Sunday of that weekend.  Immediately after this call, at 4:56
p.m., THOMPSON called DELEO.  DELEO asked how everything was
going, and THOMPSON replied that "he" (i.e., TRI LE) was still
driving and was half way there.  DELEO asked what he (i.e., TRI
LE) was going to do and whether he needed a day or two's rest.
THOMPSON said he would probably be out of there Saturday or
Sunday after getting a little rest.  DELEO said that would be
good.  Based on calls and events discussed below, I believe these
calls related to a delivery of cocaine that TRI LE was in the
process of transporting from the southwest, first to Little Rock,
and then on to DELEO in Massachusetts.

    12.  On December 8, 2008, at about 9:48 p.m., THOMPSON
called DELEO and said, "I'm going to put him on the phone and you
can tell him where abouts in Boston you are."  THOMPSON then put
an individual believed to be TRI LE on the phone.  DELEO asked
how TRI LE was doing, indicated he knew he was tired, and said,
"We gotta figure out an easier way."  DELEO then gave TRI LE
detailed driving directions from Interstate-95 to the
Massachusetts Turnpike.  TRI LE then put THOMPSON back on the
phone to get the rest of the directions and DELEO gave THOMPSON
detailed directions to the Doubletree Hotel in Cambridge.  DELEO
said that TRI LE could pull into the Doubletree Hotel and give
DELEO a call and that DELEO would get TRI LE's number from

THOMPSON once TRI LE was on the road.

13.   THOMPSON said TRI LE was due to report to the
Immigration & Naturalization Service on Wednesday (December 10)
and would leave on Thursday.  DELEO confirmed that he would be in
New York on Saturday (December 13) and therefore it would be
better to arrange for TRI LE to make the delivery on Sunday the
14th.  DELEO told THOMPSON to tell TRI LE to time it so he
arrives in Boston on Sunday and not to "hang around Boston with
the . . . you know what I'm talking about, especially in
Dorchester . . . 'cause he'll get stopped there."  Based on my
training and experience, I believe that DELEO was telling
THOMPSON to tell TRI LE not to hang around Boston, especially the
high crime area of Dorchester, with the cocaine because he would
likely get stopped by the police.

14.   On December 11, 2008, at about 12:29 p.m., THOMPSON
called DELEO and said he (i.e., TRI LE) was not going to leave
until Friday (December 12) and that THOMPSON had given him a map.
DELEO said to mark it out and make sure he knows to go to the
Doubletree and to give him a call and he (DELEO) would meet him
there "like I met you."

15.   On Friday, December 12, 2008, at approximately 3:59
p.m., Arkansas State Police instituted a traffic stop on a
vehicle being driven by TRI LE on Interstate 40 between Little
Rock and Memphis.  The police report indicates TRI LE's place of

employment as "Forbidden City Restaurant" and his cell phone number as 501-551-8801 (the number THOMPSON has been using to reach TRI LE). During a consent search of the vehicle TRI LE was driving, officers seized approximately 2.2 kilograms of cocaine.[1] TRI LE and a passenger were arrested and charged in state court.[2]

16.   On Friday evening at approximately 9:16 p.m., TRI LE called THOMPSON from Lonoke County Detention Center and asked "Hey George, can you come to bail me out?" THOMPSON replied, "Where you at?" and TRI LE said "Lonoke County Detention Center." THOMPSON said "Let me call a bondsman" and TRI LE said "Yeah, it's $50,000 bond." Following this call, at approximately 9:36 p.m., THOMPSON called DELEO and said, in relevant part, "got a problem." DELEO replied, "Uh, got a problem? . . . . What happened?" THOMPSON stated, "He got pulled over." DELEO said, "What?" THOMPSON said he had called a lawyer and thought it might be an immigration but was not sure.

17.   After a pause, DELEO asked, "Yeah, they find anything?" THOMPSON said he did not know. DELEO asked where he (i.e., TRI LE) was and before THOMPSON could answer he received a call from a lawyer and paused his call with DELEO. When THOMPSON came back

---

[1] The substance was tested by the Arkansas State Crime Lab and determined to contain cocaine hydrochloride and have a net weight of 2,206.8 grams.

[2] TRI LE subsequently pled guilty in state court to possession with intent to deliver cocaine and was sentenced to 168 months in prison.

9

on the line, he told DELEO that that was the lawyer and it's
$50,000 bond.  DELEO asked what the charge was and THOMPSON said
possession with intent.  THOMPSON said the lawyer thought he
could get the bond reduced; that he would have to post $5,000 as
it stood; and the lawyer thought he could get it reduced to
$2,500.

     18.  DELEO said that, if the bail was that low "that
possession thing is not much".  DELEO said that if they can get
him bonded out, "it's not for that".  THOMPSON agreed.  DELEO
said what he was hoping was that he (TRI LE) was not on the road
traveling yet and that he happened to just pick up something and
was arrested for that.  THOMPSON said that was what he was hoping
but they won't know for sure until Monday.  DELEO said he hoped
they weren't doing something stupid, like smoking (i.e.,
marijuana) or something.  THOMPSON assured him LE doesn't do
that.  Based on my training and experience, I believe that DELEO
was theorizing that TRI LE had not been caught with the two
kilograms because the bail would not have been so low and that
maybe he was caught with some smaller amount of drugs.

     19.  At the end of this call, DELEO told THOMPSON to call
him when he hears about the bond because if it was something
minor he was not sure if they could chance it with TRI LE hitting
the road again.  THOMPSON agreed.  DELEO noted that, if it was
anything major, he would have "no-bond . . . that's a no bond

thing".  THOMPSON told DELEO to "have a good evening," to which
DELEO responded, "how am I going to have a fucking good evening?"

20.  At approximately, 10:11 p.m. that same night (December
12, 2008), THOMPSON called DELEO again and stated that he had
talked with the bail bondsman and "what they did was a state
trooper on the interstate, he pulled them over . . . and went and
got the dog."  DELEO asked, "They got it?", and THOMPSON replied,
"Yep . . . well she knew exactly how much was there . . . she
said 2.2 kilos."[3]

21.  On December 14, 2008, at about 4:45 p.m., DELEO called
THOMPSON and they talked about TRI LE's arrest.  DELEO said, "I
don't know if I can sleep tonight.  That was devastating."
THOMPSON responded, "Worse than fucking devastating."  Based on
my training and experience, I believe that TRI LE was acting as a
runner or courier for THOMPSON and DELEO and that, since the 2.2
kilograms of cocaine was ultimately destined for DELEO in
Massachusetts, DELEO (and perhaps also THOMPSON) had likely
already paid for the cocaine that had been seized and the
reference to the arrest being "devastating" was a reference to

---

[3] Based on this incident, on October 8, 2009, a federal
grand jury in the Eastern District of Arkansas indicted THOMPSON
for conspiracy to possess with intent to distribute cocaine,
possession with intent to distribute cocaine, and using a
communication device to facilitate a drug transaction, in
violation of 21 U.S.C. §§ 846, 841(a)(1), & 843(b).

them losing their investment.[4]

22.   Beginning in late August 2009, and continuing to the
present, I and other agents in the Boston office of the FBI have
received information from a reliable confidential source of
information (hereinafter "CSI-1") about DELEO being involved in
planning a marijuana deal involving approximately 250 pounds of
marijuana coming from Canada to DELEO and others in Massachusetts
for distribution in Massachusetts.

23.   Based on the investigation, and information received
from CSI-1, it appears that DELEO's role in the Canadian
marijuana deal is similar to his role in the Little Rock cocaine
deal - i.e., that he is an investor/financier for the deal.   It
appears that the deal involves several other individuals,
including, but not limited to, FRANKLIN GOLDMAN and EDMOND
KULESZA, both longtime Boston associates of DELEO; ORESTE
ABBAMONTE, a/k/a "Ernie Boy", an associate of the Gambino crime
family of LCN; PHILIP SCIARRATTA, an associate of the Colombo
crime family of LCN; RUSSELL ASCH, an associate of the Gambino

---

[4] On October 23, 2009, FBI surveillance agents overheard
portions of a conversation that DELEO had with SAMUEL ("SAMMY")
TORLEONE, an associate of the Gambino crime family, and ORESTE
"ERNIE BOY" ABBAMONTE at the Baci Grill in Cromwell, CT.   Among
other things, the agents heard DELEO say that he had sent 50 in
the box to Little Rock, Arkansas.   Based on the investigation,
and my training and experience, I believe this was a reference to
$50,000 that DELEO sent to TRI LE by a mailing service (e.g.,
Federal Express) in Little Rock, Arkansas, as an investment in
the 2.2 kilograms of cocaine seized from TRI LE on December 12,
2008.

crime family; and SAMUEL TORLONE, an associate of the Gambino crime family.

24. According to criminal history records, GOLDMAN has convictions for conspiracy to distribute cocaine (Boston federal 1993); armed robbery (1976), distribution of controlled substances (Boston federal 1971; and larceny. According to criminal history records, ABBAMONTE has convictions for conspiracy to distribute cocaine (1992), racketeering (1983), narcotics violations (1983), distribution of heroin (1978), heroin (1970), and possession of heroin (1969). According to criminal history records, SCIARRATTA has convictions for conspiracy to commit murder in aid of racketeering (2004), assault with a deadly weapon (NY 2001), and assault with intent to cause serious injury (NY 1992).

25. Based on the investigation, and information received from CSI-1, in late August 2009, SCIARRATTA traveled to Montreal, Canada, and then contacted GOLDMAN and proposed a multi-pound marijuana deal with a connection that SCIARRATTA had in Montreal for the marijuana. On August 25, 2009, SCIARRATTA traveled to Boston from New York and met with GOLDMAN in the North End of Boston. Later that evening, GOLDMAN advised KULESZA that he had the information for DELEO from SCIARRATTA. On August 26, 2009, GOLDMAN met with KULESZA at Vinny's Superette in Somerville. During that meeting, GOLDMAN provided KULESZA with information

13

for DELEO from SCIARRATTA about the Canadian marijuana deal.
Later that evening, DELEO, GOLDMAN and KULESZA met in Medford,
Massachusetts, to further discuss the marijuana deal.  GOLDMAN
asked DELEO about the "thing" from Montreal and New York.
GOLDMAN stated that the "grass" should be given to them on the
arm.  DELEO asked what kind of grass GOLDMAN is talking about and
GOLDMAN responded "Hydro".[5]  GOLDMAN stated that they can expect
to pay between twelve hundred ($1,200) to five thousand ($5,000),
depending on what grade they are interested in.[6]  GOLDMAN stated
that his guy had five thousand coming in and that GOLDMAN'S guy
asks him how many pounds they want, forty, or whatever they want,
and that the guy indicated that they can get as much as they
want.  Based on the investigation, information received from CSI-
1, and my training and experience, I believe that, in addition to
information, SCIARRATTA provided GOLDMAN with a sample of
marijuana to provide to DELEO, and that GOLDMAN passed the sample
to KULESZA who delivered it to DELEO on August 26, 2009.

---

[5] Based on my training and experience and conversations with
other agents, I am aware that "hydro" is short for "hydroponic,"
which is a particular type of marijuana, or "grass," grown in
water, which is commonly imported from Canada, and which is
generally of higher quality, and therefore more expensive, than
many other types of marijuana.

[6] Based on my training and experience, and conversations
with other agents, I am aware that this is a typical price range
per pound for marijuana, depending on the type of marijuana being
sold.

26.   On September 28, 2009, DELEO traveled to Montreal, Canada, where he met with SAMUEL TORLONE and MICHAEL RUSSO, both of whom are Gambino LCN family associates, and VITTO VIZZI, a representative of Colombo family captain REYNOLD MARAGNI.   Based on my training and experience, and my knowledge of the investigation, the purpose of the meeting was to discuss the importation of 250 pounds of marijuana from Canada to Massachusetts for distribution.

27.   On November 8, 2009, DELEO, MARAGNI, and MICHAEL FERRARA, a member of the Colombo LCN crime family, met at the Cromwell Diner in Cromwell, CT, to discuss, among other things, the plan to import marijuana from Canada.   Agents in the diner were able to overhear portions of the conversation.   Agents overheard DELEO tell the others that 250 pounds are being shipped.   They also heard him mention "VITO".   They also heard MARAGNI state that if you go up to Montreal you are fine up there.   Based on my training and experience, I believe the individuals at this meeting were discussing their plan to import 250 pounds of marijuana from Canada for distribution in the Massachusetts area.

### OTHER EVIDENCE THAT DELEO RESIDES AT THE TARGET PREMISES

28.   Throughout the course of our investigation of DELEO, myself and other FBI agents routinely saw DELEO driving a white Lexus SUV, RX 330, Massachusetts registration 59KK02, registered

15

to RALPH DELEO at 269 Mount Auburn Street, Cambridge, MA (hereinafter the "White Lexus").[7]   Throughout the investigation, myself and other FBI agents also saw the White Lexus parked on a daily basis in the rear parking lot of the Target Residence. Specifically, we routinely saw the White Lexus parked at the Target Residence in the early morning and late evening hours.

29.   Throughout the course of our investigation of DELEO, myself and other FBI agents also saw DELEO on numerous occasions operating an older model, one speed bicycle (the "BICYCLE"). Throughout the  investigation, myself and other agents also saw the BICYCLE parked behind the Target Residence near the back door of the building that leads to the basement where the Target Residence is located.

30.   Throughout the course of the investigation, FBI agents periodically (generally, at least a few times a week) conducted surveillance of the Target Residence.   Surveillance agents have seen DELEO entering and exiting the front door of the Target Residence.   Agents have also seen on numerous occasions DELEO exiting and entering from the rear parking lot area of the Target Residence, both on foot and in the White Lexus and Bicycle.

---

[7] This address is the offices of Corporate Stay, a commercial business owned by RALPH DELEO's brother, Anthony Deleo.   RALPH DELEO's driver's license and other public database references for RALPH DELEO come back to this address.

31.  To avoid compromising the investigation, agents were unable to get close enough to see, specifically, from where DELEO exited from the rear of the Target Residence.  Based on my training and experience, and my knowledge of the investigation, however, I believe that DELEO primarily enters and exits the Target Residence through the door at the rear of the building.  I further believe that that door leads directly to the basement where the Target Residence is located.

32.  Based on information provided by CSI-1, DELEO discussed in August 2009 the fact that he lives in a little basement apartment.  Based on my training and experience, I believe that the Target Residence is an illegal or off the books apartment. According to documentation I have reviewed for 17 Russell Street, Somerville, MA, the building is described as having eight apartments.

33.  On November 8, 2009, an FBI agent used the ruse of potentially renting an apartment to visit 17 Russell Street in Somerville.  The agent advised that the basement of 17 Russell Street can be accessed both from a staircase in the lobby area of the first floor and from a staircase from the back door of the building.  Both staircases lead down hallways to a common laundry room area.  A metal green door with a peephole is located off of the laundry room area.  Based on my training and experience, and my knowledge of the investigation, I believe this green door

17

accesses the Target Residence.  There are no other doors like this door in the basement.  All other doors appear to be closet or storage doors.

34.  Based on the foregoing, there is probable cause to believe that RALPH DELEO is a cocaine and marijuana trafficker who resides at the Target Premises.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for individuals who distribute and import controlled substances to maintain in their residences records relating to their drug trafficking activities.  For example, distributors of illegal drugs are often "fronted" drugs from their suppliers and need to keep track of amounts paid and owed.  Such records are likely to be maintained close at hand so as to readily ascertain current balances and are usually hidden so as to avoid ready detection.  They are therefore likely to be located anywhere within a trafficker's residence.

35.  Based upon my training and experience, I am also aware that it is a common practice for distributors and importers of controlled substances to conceal at their residences sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.

18

Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug distribution would also typically be maintained in residences.

36.  As in this case, individuals who distribute controlled substances often stay in contact with their customers and suppliers using cellular telephone equipment.  Bills and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence and will confirm prior contacts with suppliers and customers.  Here, that equipment is likely to be anywhere inside the Target Premises and is likely to confirm contacts between DELEO and other people to whom they sold or from whom they purchased cocaine.

37.  During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification

documents, and keys.

38.   Based on my training and experience, I am aware that drug traffickers, like other individuals operating a business, often maintain the documents and records referenced above on a computer at their residence.  During the course of residential searches, I and other agents have found such items on personal computers.

39.   My awareness of these drug distribution practices, as well as my knowledge of the drug use and distribution techniques as set forth in this Affidavit, arise from my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and other information provided through law enforcement channels.

## ITEMS TO BE SEIZED

40.   Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth above, I submit that there is probable cause to believe that RALPH DELEO has used his residence in furtherance of his drug importation and distribution activities,

and that evidence regarding those illegal drug activities will be found in his residence, including, but not limited to, evidence of drug distribution to his customers and evidence of his contacts and purchases from suppliers.  More specifically, I submit that there is probable cause to believe that the following items of evidence will be found in the subject premises:

1.   Books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, such as cocaine and/or marijuana, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone, and pager numbers.  Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills.

2.   Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto. Such items include, but are not limited to jewelry, precious metals, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from

21

trafficking in illegal substances.

3.  Documents reflecting dominion and/or control of 17 Russell Street, Apt. 9 (basement apartment), Somerville, MA, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

4.  Documents or tangible evidence reflecting dominion, ownership, and/or control by RALPH DELEO over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.  Photographs of individuals, property, and/or illegal controlled substances.

6.  A computer or computers, and electronic storage media such as floppy discs, compact discs, removable hard drives, and thumb drives, containing the documents, records, and other items referenced in 1-5 above.

## CONCLUSION

41.  Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at 17 Russell Street, Apt. 9 (basement apartment), Somerville, MA, which are more specifically described above, presently contain the items set forth above, and that those items constitute evidence of the commission of a criminal offense, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically,

22

violations of 21 U.S.C. §§ 846 & 841(a)(1) and 21 U.S.C. §§ 963 & 952(a). Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in the Target Premises.

I, Todd I. Richards, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

TODD I. RICHARDS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 13 th day of November, 2009, at Boston, Massachusetts.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE



Exhibit A





